IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


ROCHELLE TONEY                          *
                                        *
                                        *
        v.                              *
                                        *        Civil No. CCB-13-3513
                                        *
UNIVERSITY OF MARYLAND                   *
MEDICAL CENTER, INC.                     *
                                        *
                                    ********

## MEMORANDUM

Plaintiff Rochelle Toney ("Toney") brings this lawsuit against Defendant University of

Maryland Medical Center, Inc. ("UMMC"), alleging that it violated the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Now pending is a motion for summary

judgment filed by UMMC. It is fully briefed, and no oral argument is necessary. *See* Local R.

105.6. For the following reasons, UMMC's motion will be granted.

## BACKGROUND

This dispute arose over a job opening in the Department of Health Information

Management ("HIM") at UMMC.[1] Jennifer Clinkscales has been a Senior Manager in the HIM

Department since 2003, where she oversees release of information ("ROI") and document

imaging. (ECF No. 25-4 at 10). She was around fifty years old during the events relevant to this

case.[2] (ECF No. 25-9 ¶ 4). In early 2011 Clinkscales posted notices for two job openings within

her group: ROI Supervisor and Document Liaison Specialist, Team Lead. (*Id.* ¶ 5; ECF Nos. 25-

10, 11). The job description for the ROI Supervisor position listed numerous qualification

---

[1] UMMC is a health care facility owned and operated by the University of Maryland Medical
System Corporation.
[2] Although the exact ages of certain parties during April–June 2011 are unclear, anyone over 40
is part of the class protected by the ADEA. 29 U.S.C. § 631(a).

criteria, including the following Education requirements: "High School Diploma or equivalent (GED) . . . Health Information Management Credentials, Associate's Degree or higher in Health Information Technology or related field is preferred." (ECF No. 25-10 at p. 4). As for experience, the job required "Two years progressively responsible technical experience within the Health Information Management field," and "Three years experience in a supervisory or Team Leader capacity, preferably within the Health Information field . . . Relevant education may substitute for supervisory experience." *Id.* The Team Lead job description, in contrast, only required a high school diploma (or equivalent) and did not require prior supervisory experience. (ECF No. 25-11).

Around late February or early March, two candidates applied for the ROI Supervisor position: Plaintiff Toney, forty-three years old, and Aziza Holmes-Lloyd ("Holmes-Lloyd"), thirty-two years old. (ECF No. 25-7). Toney earned an Associate's Degree in General Studies and since 2007 had been working at various temporary assignments through the Mary Kraft & Associates Staffing Agency. (ECF No. 25-15). Those temporary assignments included ROI work, but Toney's most recent supervisory experience was in 2001. As for Holmes-Lloyd, she earned a Bachelor's of Science Degree in Business/Management Science and had been an Administrative Coordinator/Supervisor in the Office of Billing Quality Assurance at the Johns Hopkins University School of Medicine since December 2007. (ECF No. 25-18). Holmes-Lloyd's technical expertise was in compliance billing, where she ensured medical records were properly coded to reflect which medical services had been rendered. (ECF No. 25-6 at 22–25).

Jennifer Cyran, a UMMC Human Resources Recruiter, initially reviewed Toney's and Holmes-Lloyd's applications and determined that both met the minimum qualifications for the ROI Supervisor position. (ECF No. 25-13 ¶ 4). Cyran forwarded their applications to

Clinkscales, who decided to interview both women.  (*Id.* ¶ 5–6).  At no time during the process

(including when she met both women during their interview) was Cyran aware of their ages.  (*Id.*

¶ 12).  Toney was interviewed first, on March 10, 2011.  During her interview with Clinkscales,

which Toney described as "informal," Toney discussed her resume, Clinkscales's husband who

worked at Johns Hopkins, and general expectations of the job.  (ECF No. 25-5 at 69–73).  The

parties dispute whether the following two events occurred: first, Clinkscales claims Toney stated

there were "rumors" that Clinkscales was difficult to work for.  Second, Toney claims that

Clinkscales asked Toney why she did not dye her gray hair, since it made her look older than she

was.  (ECF No. 25-5 at 77).

A few days later, Clinkscales interviewed Holmes-Lloyd.  They discussed the position,

Holmes-Lloyd's education, and her training.  (ECF No. 25-6 at 39–40).  Clinkscales thought

Holmes-Lloyd had the better interview because she expressed enthusiasm about the position and

touted her supervisory experience.  (ECF No. 25-4 at 184–85).  Holmes-Lloyd was invited back

for a second interview, at the conclusion of which Clinkscales informed her that she was going to

be hired for the ROI Supervisor position.  (*Id.* at 41–42, 45).  Clinkscales decided that she would

offer the other open job to Toney—Document Liaison Specialist, Team Lead.

Neither candidate was hired immediately because of a temporary hiring freeze.

Clinkscales offered Toney a temporary position at UMMC as an ROI Tech I through Spherion

Staffing, which Toney accepted.  (ECF No. 25-5 at 75, 78).  She began working under

Clinkscales in early April 2011.  *Id.*  After the hiring freeze was lifted a few weeks later,

Holmes-Lloyd was formally offered and accepted the ROI Supervisor position.  About two

weeks later, Toney was offered the Document Liaison Specialist, Team Lead position and also

accepted.

3

Toney started working in the Team Lead position a few weeks after Holmes-Lloyd began as ROI Supervisor, and Toney claims she became frustrated with the amount of backlogged work that she was responsible for in addition to answering questions from Holmes-Lloyd, her supervisor, on what Toney states was "a daily basis." (ECF No. 25-5 at 126–27). Holmes-Lloyd acknowledges that Toney trained her on the "day-to-day little things" regarding the technical aspects of the ROI work. (ECF No. 27-9 at 147). As for Clinkscales, Toney alleges she made additional comments about Toney's hair similar to the one made during her interview. (ECF No. 25-5 at 146–47). Clinkscales allegedly asked Toney why she did not dye her hair or wear a wig, since the gray color made Toney look older than she actually was. Toney was not the only HIM Department employee to face comments like these from Clinkscales, who was "unprofessional" toward "a lot of the employees" according to Holmes-Lloyd. (ECF No. 25-6 at 75:16–76:6). Toney also observed Clinkscales being rude to "a mixture" of younger and older employees. (ECF No. 25-5 at 223). Indeed, Toney claims that Clinkscales made several women cry in the office due to comments about their "hair . . . makeup . . . attire and [their] size." (Id. at 206:12–207:13).[3]

Toney submitted a letter of resignation (to Holmes-Lloyd, her immediate supervisor) on August 5, 2011. (ECF No. 25-23). Holmes-Lloyd struggled as the ROI Supervisor and after UMMC issued several corrective actions it terminated her employment on November 4, 2011. (ECF No. 25-24). Toney filed a timely charge of discrimination against UMMC with the Equal Employment Opportunity Commission ("EEOC"), and after receiving a Dismissal and Right to

---

[3] The testimony of Toney and Holmes-Lloyd on this issue is corroborated in part by a May 6, 2014 email sent to Eugene Jones, Director of HIM and Clinkscales's manager. The email is three years after the events relevant to this lawsuit, but describes how Clinkscales's "team expressed Concern with [her] unprofessional behavior towards them. It was noted she was rated poorly on the employee survey, and she did not handle the remarks well." (ECF No. 27-21).

Sue notice, filed a timely complaint in the United States District Court for the District of

Maryland on November 21, 2013.  (ECF No. 1).[4]

## STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir.) (quoting *Dulaney v. Packaging Corp. of Am.*, 673

F.3d 323, 330 (4th Cir. 2012)), *cert. denied*, 134 S. Ct. 681 (2013).  "A fact is material if it

'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247-48.  The court must view the

evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v.*

*Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of*

*the Courts*, --- F.3d ---, No. 13-2212, 2015 WL 1062673, at *4 (4th Cir. Mar. 12, 2015).  At the

same time, the court must "prevent factually unsupported claims and defenses from proceeding

to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

---

[4] The EEOC's Dismissal and Right to Sue documentation was not attached as an exhibit to either party's briefing.

**ANALYSIS**

Under the ADEA, a plaintiff must "demonstrate that the employer engaged in disparate treatment because of the employee's age and, accordingly, age must be the but-for cause of such treatment." *EEOC v. Baltimore Cnty.*, 747 F.3d 267, 273 (4th Cir. 2014) (citing *Gross v. FBL Fin. Serv.*, 557 U.S. 167, 177–78 (2009)) (internal quotation marks omitted). There are two methods by which a plaintiff can prove that age was the but-for cause of the adverse employment action: the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); and producing direct or circumstantial evidence that "discrimination motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004). Here, Toney argues that she has sufficient evidence under both methods to withstand UMMC's motion for summary judgment. Because Toney cites the same evidence as both "direct evidence" of discrimination and also to demonstrate that UMMC's proffered non-discriminatory rationale was pretext, her claim is primarily analyzed under the *McDonnell Douglas* framework to avoid repetition.

That framework first places the burden of production on Toney to establish a prima facie case of discrimination. *See Hill*, 354 F.3d at 285. The burden then shifts to UMMC to proffer a legitimate non-discriminatory rationale for its adverse employment action, after which the burden returns to Toney to demonstrate that UMMC's rationale was a pretext for age discrimination. *Id.* Because the evidence cited by Toney is insufficient to prove either pretext or discrimination, UMMC's motion for summary judgment will be granted.[5]

---

[5] In its motion for summary judgment, UMMC argues that Toney has not established a prima facie case of age discrimination because she was not "similarly qualified" to Holmes-Lloyd. *See Davenport v. Anne Arundel Cnty. Bd. of Educ.*, 998 F. Supp. 2d 428, 436 (D. Md. 2014). Although the question of Toney's qualifications is at the core of this case, it is best addressed as UMMC's proffered non-discriminatory rationale that Toney must prove was pretext. Because

**I.   UMMC's non-discriminatory rationale is legitimate.**

UMMC's non-discriminatory rationale is that Clinkscales believed Holmes-Lloyd's education and work experience—namely her supervisory experience—made her more qualified than Toney for the ROI Supervisor position.  Regarding education and training, the job description required a High School Diploma or equivalent but preferred credentials in "Health Information Management" and an Associate's Degree or higher in Health Information Technology or a related field.  (ECF No. 25-10).  As for the candidates, Toney earned an Associate's Degree in General Studies and completed 30 credits in the Health Information Technology Program at Baltimore City Community College.  (ECF No. 25-15).  Toney's resume also listed her as "EPIC Certified" in several topics, including "ICD-9 Coding" and "experience with Incomplete Deficiency Compliance."  Holmes-Lloyd earned a more advanced degree, a Bachelor's of Science Degree in Business/Management Science, and had also completed (or at least participated in) two training programs at Johns Hopkins, one of which was in Supervisory training.  (ECF No. 25-18).

Regarding the candidates' work experience, the ROI Supervisor position required "technical experience within the Health Information Management field" and "three years experience in a supervisory or Team Leader capacity, preferably within the Health Information field."  The candidates had essentially the opposite backgrounds: Toney was more experienced in the technical aspects of the job, whereas Holmes-Lloyd had more supervisory experience. For example, Toney had worked at several part-time jobs through the Mary Kraft & Associates Staffing Agency since December 2007.  In those roles she worked on both ROI and document

---

establishing a prima facie case is "relatively easy . . . and is not onerous," the court will assume *arguendo* that Toney has established a prima facie case.  *See Young v. Shore Health Sys.*, 305 F. Supp. 2d 551, 560 (D. Md. 2003) (internal quotation marks omitted).

scanning, including a recent assignment at the Healthport Document Imaging Company.  Toney

was less qualified for the supervisory aspect of the job, however, because her last experience in

that capacity was in 2001 when she was a Day Shift Supervisor for Release of Information at

Sinai Hospital in Baltimore.  There is no evidence of any other, more recent supervisory training

or experience.

Holmes-Lloyd, in contrast, had more robust supervision credentials but less exposure to

the technical aspects of ROI.  She had been working full-time at Johns Hopkins since February

2002, and had been promoted to progressively more responsible positions.  When she applied to

the ROI Supervisor position, she had been working since December 2007 as an Administrative

Coordinator/Supervisor in the Johns Hopkins University School of Medicine's Office of Billing

Quality Assurance.  She managed three staff members and helped coordinate the daily meetings

and schedules of a Senior Director, Director, and nine audit compliance specialists.  (ECF No.

25-6 at 25:2–12).  As for relevant technical experience, one of her responsibilities was to review

medical records to ensure that they were properly coded.  She had worked previously with ROI,

but not since 1998.

Based on the candidates' qualifications, their interviews, and the requirements of the two

open jobs, Clinkscales offered the ROI Supervisor position to Holmes-Lloyd and the Document

Liaison Specialist, Team Lead position to Toney.  Clinkscales believed that these matches

maximized the strengths of each candidate: Holmes-Lloyd would draw on her past several years

as a Supervisor and Toney would utilize her intimate technical knowledge of ROI.  Specifically

regarding Toney's qualifications for the job, Clinkscales noted that her "supervisory experience

was dated."  (ECF No. 25-4 at 200:21–201:1).  Moreover, Clinkscales anticipated that the ROI

Department would be reorganized within six months, allowing the candidate for the ROI

Supervisor position to be promoted and the candidate hired for the Team Lead position to take

over as the new ROI Supervisor.  (ECF No. 25-4 at 199:9–201:13).  Accordingly, she highly

valued a candidate's supervisory experience.  Clinkscales admitted that Holmes-Lloyd was

relatively deficient in ROI experience, but the Supervisor's main tasks would be managing

employees and focusing on broader strategic goals and initiatives, whereas the Team Lead

position required a greater degree of technical knowledge.[6]  Clinkscales believed that Holmes-

Lloyd's familiarity with medical coding would enable her to learn enough about ROI to be

successful.

Clinkscales's explanation of her rationale for hiring Holmes-Lloyd instead of Toney is

legitimate and supported by the evidence.  *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.

1998) (affirming summary judgment in favor of the employer based in part on its selecting the

candidate with "superior administrative experience").  It is also "legally sufficient to justify a

judgment" in UMMC's favor.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255

(1981).  Under *McDonnell Douglas*, the burden now shifts back to Toney to demonstrate that

this rationale was pretext to hide Clinkscales's true but-for motive: age discrimination.

## II.  The evidence does not demonstrate pretext or discrimination directly.

In order to prove that an employer's proffered non-discriminatory rationale is pretext, a

plaintiff must produce sufficient evidence from which a reasonable fact-finder could conclude

"that the employer is dissembling to cover up a discriminatory purpose."  *Reeves v. Sanderson*

---

[6] Clinkscales also based her decision to hire Holmes-Lloyd in part on her stronger interview. (ECF No. 25-4 at 191:20–21).  The court will assume that Clinkscales is allowed to rely, in part, on subjective criteria, so long as she also considered objective factors like work experience.  *See, e.g., Henderson v. Anne Arundel Cnty. Bd. of Educ.*, 54 F. Supp. 2d 482, 484 (D. Md. 1999). Because the parties dispute what Toney said during her interview, however, the court's decision to grant UMMC's motion for summary judgment relies solely on the objective criteria of the candidates' education and work experience.

*Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  One method is for the plaintiff to demonstrate

"that the employer's proffered explanation is unworthy of credence."  *Holland v. Washington*

*Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Burdine*, 450 U.S. at 256 (1981)).  Here,

Toney offers three arguments for why UMMC's rationale is not credible: (1) Toney and Holmes-

Lloyd both thought Toney was more qualified for the position; (2) Clinkscales improperly relied

on subjective criteria; and (3) Clinkscales's comments about Toney's gray hair demonstrate that

her true motive for selecting Holmes-Lloyd was age.  Each is discussed in turn.

First, when evaluating an employer's decision to hire the person it believed was the

better-qualified candidate, the relevant opinion is the employer's—not the candidates' or co-

workers' opinions.  *See Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 444 (4th Cir. 1998) ("It

is the perception of the decision maker which is relevant to the question of retaliation, not the

opinions of [plaintiff's] co-workers or other third parties."), *overruled on other grounds by*

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (internal quotation marks

omitted).  Here, although Toney and even Holmes-Lloyd now state that Toney was better

qualified for the ROI Supervisor position, Clinkscales disagreed.  Based on her years of

experience as HIM Senior Manager and having hired numerous employees (including at least 29

who were over the age of forty), she believed that Holmes-Lloyd's education and supervisory

experience better qualified her for the position when compared to Toney.  (ECF Nos. 25-9 ¶ 9;

25-2 at p. 19 n. 112).  Her opinion was reasonable and based on objective criteria, and is not cast

into doubt by the opinions of Toney and Holmes-Lloyd.[7]  Also, even though Holmes-Lloyd was

---

[7] Contrary to Toney's argument on page 23 of her response in opposition brief, the ROI
Supervisor job description clearly requires "Three years experience in a supervisory or Team
Leader capacity, preferably within the Health Information field."  (ECF No. 25-10 at p. 4).

ultimately terminated for poor performance, the court must evaluate the legitimacy of

Clinkscales's non-discriminatory rationale based on the facts known to her in March 2011.

Second, Toney argues that Clinkscales improperly relied on her subjective assessment of

the two candidates' interviews.  Toney claims that subjective assessments do not allow courts to

properly review employment decisions, citing *Lilly v. Harris-Teeter Supermarket*, 842 F.2d

1496, 1506 (4th Cir. 1988).  The *Lilly* court did explain the potential for abuse when an employer

considers subjective criteria, but importantly stated that "Harris-Teeter considered *only*

subjective criteria in making warehouse promotion decisions."  *Id.* (emphasis added).  *Lilly* is

distinguishable from this case, therefore, because Clinkscales did not rely "only" on subjective

factors, but also the experience and education of both candidates, including the fact that Toney

had been working through a temporary staffing agency since December 2007 while Holmes-

Lloyd had been in a supervisory position at Johns Hopkins for the past several years.  Moreover,

the Fourth Circuit has endorsed relying in part on subjective criteria when making hiring

decisions, such as a candidate's "good interpersonal skills and . . .  ability to lead a team" when

the position includes managerial responsibilities.  *Amirmokri v. Baltimore Gas and Elec. Co.*, 60

F.3d 1126, 1130 (4th Cir. 1995).  The fact that Holmes-Lloyd's enthusiasm for the position and

personality were factors considered by Clinkscales is not evidence of pretext.

Finally, Toney argues that Clinkscales's comments about her gray hair—that it made her

look older than she was—is evidence that her true motive for hiring Holmes-Lloyd was her

younger age.  UMMC does not directly deny that Clinkscales made those statements, but argues

instead that the comments boil down to Clinkscales's "purported propensity for making

inappropriate remarks about subordinates."  (ECF No. 29 at p. 5).  There was one comment

during the interview, and a few more after Toney began working.  As for those latter comments,

because Toney is not alleging a hostile work environment, they are relevant only to the extent they are probative of Clinkscales's state of mind when she hired Holmes-Lloyd. The comments were inappropriate, but when viewed in context they would not permit a reasonable fact-finder to conclude that Clinkscales's rationale for hiring Holmes-Lloyd for the Supervisor position was pretext. Nor has Toney demonstrated "a nexus between" the comments and Clinkscales hiring Holmes-Lloyd instead of her. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Indeed, Toney also was hired, into a position from which she might later have been promoted. Instead, the comments illustrate Clinkscales's "propensity" to critique her female subordinates' attractiveness, hair color, and sartorial choices.

For example, Toney states that Clinkscales made an employee cry after commenting on "her hair, her makeup and her attire and her size." (ECF No. 25-5 at 207:7–15). Holmes-Lloyd also remembers hearing Clinkscales discuss a younger employee's clothing and makeup. (ECF No. 25-6 at 86:1–11). Clinkscales made these comments to a mixture of employees—old and young—and Holmes-Lloyd does not remember Clinkscales tying the hair color comments to any employee's age, including Toney. (ECF No. 25-6 at 88:5–15) (describing the comments to Toney as "[n]ot about her age, but . . . about her hair"). Clinkscales herself was also over forty when she made the alleged comments, a further indicator that she engaged in inappropriate behavior, not age discrimination.

The undisputed facts show that Clinkscales made similar comments to a variety of employees and had hired employees both over and under forty throughout her tenure as Senior Manager. In summary, no genuine dispute has been shown about whether her purported rationale for hiring Holmes-Lloyd was pretext. Accordingly, Toney cannot meet her burden on

the pretext step under *McDonnell Douglas*, and summary judgment in favor of UMMC is

warranted.[8]

## CONCLUSION

For the reasons stated above, UMMC's motion for summary judgment will be granted.  A

separate order follows.


_____3/31/2015_____                        _____/s/_____
Date                                           Catherine C. Blake
                                               United States District Judge

---

[8] Toney also cites the same comments as direct evidence of discrimination.  Rather than repeat
the same analysis under a different heading, it is sufficient to note that just as the comments are
insufficient to prove pretext, they also would not permit a reasonable fact-finder, under all the
circumstances, to infer that age discrimination was the but-for cause of Clinkscales's hiring
Holmes-Lloyd for the Supervisor position instead of Toney.